OPINION
{¶ 1} Plaintiff-appellant, Robert Bishop ("Bishop"), appeals from the judgment of the Portage County Common Pleas Court granting summary judgment in favor of defendants-appellees, Nelson Ledges Quarry Park, Ltd. ("Nelson Ledges") and Evan Kelley ("Kelley"). We affirm the decision of the trial court.
 {¶ 2} The appeal before this court arises from the tragic drowning death of Eric Bishop ("Eric"), which occurred at Nelson Ledges Quarry Park ("the park") on July 31, 2000.
 {¶ 3} The park is a campground, situated on approximately 110 acres, and includes a 30 acre swimming lake for its patrons. The park is owned by Nelson Ledges, an Ohio Limited Liability Corporation, owned by Joretta ("Joretta") and Glenn ("Glenn") Frohring. The park is operated by JE Management, ("JE"), a sole proprietorship owned and operated by Kelley, Joretta's son and Glenn's stepson.
 {¶ 4} The relevant facts of the incident are as follows. On the afternoon of July 31, 2000, Eric and five of his friends came to Nelson Ledges to swim. Upon entry to the park, each vehicle is stopped at the gate. A fee of $5 is collected from each visitor and each visitor is required by a park employee to sign a sign-in sheet, containing a waiver of liability clause, before entry to the park is granted. If some of the visitors are children, their parent, or another responsible adult, is required to sign the form.
 {¶ 5} The top portion of the sign-in sheet contains a waiver of liability statement in print which fits within the top approximately two-and-a-half to three inches of the sheet, including margin spaces, with rectangular spaces for the signatures of park patrons contained below. The sign-in sheet is kept with park employees. The waiver language at the top of the sign-in sheet, states as follows:
NELSON LEDGES QUARRY PARK LIABILITY WAIVER FORM
Persons under 18 years of age must have an adult/guardian sign for them
CUSTOMERS AND COMPANY AGREE: When you enter Nelson Ledges Quarry Park, LLC, you agree that it is at your sole risk; that you will abide by all the park rules; that you will retain care and control of your car: its parts and contents. Company is not responsible for your car, articles left in your car, loss of use; all liability for any loss including but notlimited to, any loss arising from bodily injury, personal injury ordrowning. (Emphasis added). We the company do not accept responsibility of any personal injury or loss caused due to the influence of alcohol or other mind altering substances, or food consumed from private vendors. NOILLEGAL SUBSTANCES ARE PERMITTED IN THE CAMPGROUND. I/We hearby (sic) release Nelson Ledges Quarry Park LLC and JE Management from any liability whatsoever arising from use of the park. No employee may modify any of the terms herein.[1]
 {¶ 6} It is undisputed that Eric, who was eighteen years of age, and his friends all signed the sheet prior to their admission to the park on the day of the incident. Once inside the park, Eric and his friends decided not to go to the designated beach area, but instead decided to go to another area, called the "stony outcropping" or alternatively, the "drive-down area". There is a small island located in the water about 40 to 50 yards from the shore of the "drive down" area. Shortly after arriving, Eric and two of his friends decided to swim out to the island.
 {¶ 7} Eric began to experience difficulty about 10 to 15 feet short of the island, and began thrashing about and calling for help. His friends, who had reached the island before Eric, at first thought that he was goofing around. When they realized he was serious, his friends dove into the water to try to save him. Despite his friends' efforts to save him, Eric slipped under the water. People on the shore who witnessed the incident ran off to summon park personnel for help.
 {¶ 8} Within a few minutes after arriving, park personnel, who were certified in lifesaving, located Eric about 10-15 feet away from the spot where he had initially gone under the water. Park personnel then took Eric back toward the island, so that they could try to resuscitate him, but they were unsuccessful. All of these events, from the time Eric began to experience trouble, to the time park personnel attempted to revive him, took place within the span of 17 to 20 minutes.
 {¶ 9} On June 10, 2002, Bishop and his wife Janine, as co-executors of their son Eric's estate, filed wrongful death action, pursuant to R.C.2125.01 et. seq. against Nelson Ledges Quarry Park, LLC, Glenn and Joretta, and Kelley, alleging that all named defendants were negligent, and that their negligence was the direct and proximate cause of Eric's death.
 {¶ 10} On October 1, 2003, Nelson Ledges, Glenn and Joretta, and Kelley collectively moved for summary judgment.
 {¶ 11} Bishop then filed a memorandum in opposition to summary judgment, attaching as support an affidavit from Tom Griffiths, Ed.D. ("Griffiths"), an aquatic safety expert, along with a report, incorporated by reference, in which Griffiths testified to "a high degree of aquatic certainty," that "the conduct of allowing swimming in unrestricted areas, given the numerous instances highlighted in this report regarding the failure of the defendants to comply with even the most basic water safety requirements * * * created a risk that was substantially greater than that which is necessary to make their conduct simply negligent."
 {¶ 12} On January 12, 2004, the trial court, after reviewing all of the pleadings, motions, and evidence filed, issued a four page order and judgment entry granting summary judgment in favor of all of the defendants. After setting forth the standards for summary judgment, the court made the following conclusions of law: 1) That defendants Glenn and Joretta Frohring are entitled to summary judgment, pursuant to R.C.1705.48(A) and (B), since they are principals of a limited liability company.[2] 2) That, even when reviewing all of the evidence in the light most favorable to the plaintiff, including the report of Tom Griffiths, defendants' conduct did not rise to a level of reckless, willful or wanton conduct, but at most, suggested there may be a genuine issue of material fact as to negligence. 3) The waiver was valid, as a matter of law, thus, Eric waived all claims of negligence, and Bishop was barred from recovering on the wrongful death claim.
 {¶ 13} Bishop timely appealed and raised the following assignments of error:
 {¶ 14} "[1.] The trial court erred in failing to apply the standards for determination of motions for summary judgment.
 {¶ 15} "[2.] The trial court erred in granting summary judgment in favor of appellee Nelson Ledges Quarry Park, Ltd. based on alleged lack of possession or control of leased premises.
 {¶ 16} "[3.] The trial court erred in granting summary judgment for appellees on the ground that a valid release executed by Eric Bishop released appellees from liability."
 {¶ 17} As all of Bishop's assignments of error question the propriety of the trial court's grant of summary judgment, we will first address the applicable standards of review.
 {¶ 18} "Summary judgment is a procedural device to terminate litigation and to avoid formal trial when there is nothing to try. It must be awarded with caution." Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359. Summary judgment is proper when three conditions are satisfied: 1) there is no genuine issue of material fact; 2) the moving party is entitled to judgment as a matter of law; and 3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion form summary judgment is made. See, Harless v. Willis Day Warehousing Co. (1976), 54 Ohio St.2d 64,66; Civ.R. 56(C). "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R.56(E) to set forth specific facts showing that there is a genuine issue for trial, and if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Dresher v. Burt, 75 Ohio St.3d 280,293, 1996-Ohio-107. In reviewing a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party. Doe v. Shaffer, 90 Ohio St.3d 388, 390, 2000-Ohio-186. Moreover, an appellate court conducts a de novo review of the trial court's decision to grant summary judgment. Id. Thus, we, as an appellate court, owe no deference to the conclusions of the trial court.
 {¶ 19} In order to prevail in a wrongful death cause of action, the personal representative of the decedent must prove these elements: "1) a wrongful act, neglect or default of defendant which proximately caused the death and which would have entitled the decedent to maintain an action and recover damages if death had not ensued; 2) that a decedent was survived by a spouse, children, parents, or other next of kin; and 3) that the survivors suffered damages by reasons of the wrongful death." McCormac, Wrongful Death in Ohio § 2.02. Bishop's assignments of error challenge the court's conclusions related to the first element, which may sound in either negligence or willful misconduct.
 {¶ 20} For the purposes of judicial economy, Bishop's assignments of error will be discussed out of order.
 {¶ 21} In his third assignment of error, Bishop claims that the trial court improperly granted summary judgment, because there is a genuine issue of material fact with respect to the validity of the release executed by Eric on the day he drowned. We note at the outset, that Bishop does not argue that Eric did not sign the waiver form. However, Bishop does argue that if the exculpatory provisions in this waiver were strictly construed, the waiver would fail as a matter of law, because the intent to release the party was not expressed in clear and unequivocal terms. We disagree.
 {¶ 22} It is well-settled in Ohio that participants in recreational activities and the proprietor of a venue for such an activity are free to enter into contracts designed to relieve the proprietor from responsibility to the participant for the proprietor's acts of negligence, but not for his willful or wanton misconduct. See, Bowen v.Kil-Kare, Inc. (1992), 63 Ohio St.3d 84 (auto racing); Zivich v. MentorSoccer Club, Inc., 82 Ohio St.3d 367, 1998-Ohio-389 (soccer); King v.United Skates of America (Nov. 10, 1994), 11th Dist. No. 93-L-199, 1994 Ohio App. LEXIS 5089 (roller skating); Cain v. Cleveland ParachuteTraining Ctr. (1983), 9 Ohio App.3d 27 (skydiving); Schwartzentruberv. Wee-K Corp. (1997), 117 Ohio App.3d 420 (horseback riding). Clauses limiting liability shall ordinarily be construed strictly against the drafting party. Glaspell v. Ohio Edison Co. (1987), 29 Ohio St.3d 44, at paragraph one of syllabus; Cain, 9 Ohio App.3d at 28. Moreover, matters involving the interpretation of contract terms, when such terms are unambiguous, are questions of law. See, Nationwide Mut. Fire Ins. Co. v.Guman Bros. Farm, 73 Ohio St.3d 107, 108, 1995-Ohio-214.
 {¶ 23} Reviewing the terms of the waiver language in the light most favorable to Bishop, we hold that there is no genuine issue of material fact related to the validity of the waiver that Eric signed. While inartfully drafted, the sheet Eric signed is clearly labeled at the top as a "Liability Waiver Form" in bold type. Moreover, the form states, in relevant part, that the company and customers agree that the company is not responsible for, "all liability for any loss, including, * * * anyloss arising from * * * drowning." (Emphasis added). Thus, any person signing the waiver sheet was on notice that the company was attempting to disclaim all liability for drowning, which is certainly a foreseeable risk of the activity. The term, "all liability" in this case is sufficient to encompass a loss from drowning due to any alleged negligence on the part of Nelson Ledges or Kelley. See, e.g.Schwartzentruber, 117 Ohio App.3d at 425 (although "[t]he better practice would certainly be to expressly state the word `negligence' somewhere in the exculpatory provision * * * the absence of that term does not automatically render the provision fatally flawed.") For the reasons mentioned in Bowen, such a broad disclaimer of liability would not, as a matter of law, operate to relieve them from willful or wanton misconduct. Moreover, the obvious purpose of the writing on the document was to release Nelson Ledges and Kelley, d.b.a. JE, from liability. This argument is not well-taken.
 {¶ 24} Bishop additionally argues that the waiver cannot pass the test of clarity, since the exculpatory provisions appear in extremely small type. We disagree. Bishop, relying on the California case, Link v.NASCAR, Inc., (Cal.App. 1984), 158 Cal.App.3d 138, argues that if an express release is not easily readable, then it is not enforceable. Bishop's reliance on Link is misplaced.
 {¶ 25} We first note that the rules of law from other states are not controlling in Ohio, but may be used as persuasive authority, particularly when deciding a case of first impression. Certain facts ofLink are similar to the instant case, in that the suit was brought for wrongful death as the result of injuries the deceased received after he had signed a waiver sheet which had places for multiple signatures. However, the purported releases that the deceased in Link signed were printed in five-and-one-half point type and could not easily be read by persons of ordinary vision. Furthermore, the court in Link found that the language was so lengthy and convoluted, it was almost incomprehensible to the average person. In deciding the case, the court in Link relied heavily on numerous provisions of the California Civil Code, which regulate the size of the type to be used in contract provisions, to support their argument. Ohio has no such provisions. While we agree in broad principle that contract provisions, particularly those which purport to waive liability, should be printed in type large enough for a person of normal vision to read easily, the waiver in the case at bar satisfies these requirements. As we already mentioned, we find the terms of the waiver in this case were sufficiently clear to put the person signing it on notice. We agree with the trial court that Eric effectively waived all claims based on negligence by signing the waiver form. Thus, Bishop's third assignment of error is without merit.
 {¶ 26} Under Bishop's first assignment of error, he argues that even if the court was correct in declaring that the waiver is valid as a matter of law, summary judgment should not have been granted, since the report of Bishop's aquatic safety expert raised a genuine issue of material fact as to whether Kelley and Nelson Ledges engaged in willful and wanton misconduct. We disagree.
 {¶ 27} We note at the outset, that since we have found Eric's waiver of liability to be effective against negligence claims, Griffiths' report may only be used to demonstrate willful and wanton misconduct. Willful and wanton misconduct has been defined by the Ohio Supreme Court as the equivalent to reckless conduct. Thompson v. McNeill (1990),53 Ohio St.3d 102, 104 n. 1. An actor's conduct is reckless when "he does an act or intentionally fails to do an act which it is his duty * * * to do, knowing or having reason to know of facts which could lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk issubstantially greater than that which is necessary to make his conductnegligent." Id. at 104-105 (citation omitted) (emphasis added). "An act is negligent if it `falls below a standard established by the law for the protection of others against unreasonable risk of harm." Id. at 103 (citation omitted). While the act must be intended by the actor to be reckless, "the actor does not intend to cause the harm which results from it." Id. at 105 (citation omitted). Moreover, the risk itself must be "anunreasonable one under the circumstances." Id. (emphasis sic).
 {¶ 28} An expert opinion may be incorporated by reference into a motion for summary judgment by means of a properly framed affidavit. See, e.g., Rogoff v. King (1993), 91 Ohio App.3d 438, 446. However, it is axiomatic that facts presented in affidavits supporting or opposing summary judgment must be of the type which would be admissible at trial.
Civ.R. 56(E); Nu-Trend Homes, Inc. v. Law Offices of DeLibera, Lyons, Bibbo, 10th Dist. No. 01AP-1137, 2003-Ohio-1633, at ¶ 71.
 {¶ 29} Griffiths' report makes reference to recommendations made by the Portage County Health Department ("the Department"), which is responsible for establishing licensing and health requirements for bathing beaches in the county. Kelley's duty as operator of the park is predicated by regulations set by the Department. The referenced recommendations were suggested improvements made by the Department in2001, almost an entire year after Eric's accident, and a major portion of Griffiths' report is devoted to Kelley's response to these recommendations.
 {¶ 30} This court has held that "subsequent remedial measures are not admissible to prove negligence or culpable conduct in connection with the event at issue." DiCesare v. Trumbull Cty. Bd. of Commrs. (Dec. 19, 1986), 11th Dist. Nos. 3620 3622, 1986 Ohio App. LEXIS 9404, at *6, citing Evid.R. 407. Thus, none of the evidence of subsequent measures in Griffiths' report is admissible under Evid.R. 407 to prove negligence or culpable conduct in connection with Eric's drowning.
 {¶ 31} Griffiths' report also bases its conclusion, in part, on Resolution 95-01, which was promulgated by the Department and in effect at the time of the accident. Specifically, Griffiths' points to the provisions of Resolution 95-01 which called for "one or more qualified lifeguards for each 300 linear feet of occupied bathing beach" to be on duty and "when swimming outside of designated swimming and diving areas * * * is permitted * * * at least one rescue boat, or rescue board shall be provided and manned with a qualified lifeguard."
 {¶ 32} Kelley and Nelson Ledges do not dispute that there was only one lifeguard on the beach and no one patrolling in a kayak, at the time of the accident, even though there were staff working at the park that day who were certified lifeguards. The reason given for only one lifeguard on duty that day was that it was a slow day, as it had rained earlier that morning. The sole lifeguard on duty that day was stationed at the beach, watching over children who were swimming in the designated swimming area.
 {¶ 33} However, the absence of a rescue boat on duty on the date of Eric's drowning, as required by Resolution 95-01 does not create a genuine issue of material fact as to whether Kelley's or Nelson Ledges' conduct was willful and wanton. To hold otherwise would misconstrue the meaning of the term "standard established by law for the protection of others," pursuant to Thompson.
 {¶ 34} The threshold issue in determining willful and wanton misconduct is to determine what legal duty Kelley owed Eric as a visitor to the park. Since Eric paid an admission charge to Kelley for the purpose of swimming at the park, it is clear that Eric was a business invitee on the day of his drowning. The Supreme Court of Ohio has defined a business invitee as "one rightfully on the premises of another for the purposes in which the possessor of the premises has a beneficial interest." Sheibel v. Lipton (1951), 156 Ohio St. 308, at paragraph one of the syllabus; Monaco v. Red Fox Gun Club, Inc., 11th Dist. No. 2000-P-0064, 2001 Ohio App. LEXIS 6008, at *21, 2001-Ohio-4040.
 {¶ 35} Under common law, the duty owed by an owner of a premises to a business invitee is to "exercise ordinary care and to protect [the invitee] by maintaining the premises in a safe condition." Id. at *21-*22. Thus, the next question then becomes, whether Resolution 95-01 imposes an additional legal duty on Kelley over and above the common-law duty of ordinary care.
 {¶ 36} Courts in Ohio uniformly recognize that the violation of legislative enactments which create a specific and mandatory duty for the protection of others constitutes negligence per se. Klyn v. Aruta (1986),34 Ohio App.3d 152, 154; Tome v. Berea Pewter Mug, Inc. (1982),4 Ohio App.3d 98, 103; Parker v. Copey's Butcher Shop (Dec. 14, 1992), 2nd Dist. No. 2820, 1992 Ohio App. LEXIS 6496, at *6; Starost v.Bradley (Jan. 29, 1999), 2nd Dist. No. 17319, 1999 Ohio App. LEXIS 324, at *12 ("[p]roof of negligence per se means that the Defendant possessed a duty imposed by statute and breached that duty"). Thus, in cases where a mandatory legal duty is imposed by statute, the "specific requirementsof the statute or ordinance replace the rule of ordinary care." Kehrerv. McKittrick (1964), 176 Ohio St. 192. (emphasis sic).
 {¶ 37} According to their express terms, Resolution 95-01 and the regulations created thereunder were adopted by the Portage County Department of Health for the licensing and health requirements of bathing beaches. The resolution purportedly derives its power to adopt regulations under the authority of R.C. 3707.01 and R.C. 3709.21, as well as under Ohio Administrative Code 3701-31-10.
 {¶ 38} R.C. 3707.01 charges boards of health of cities or general health districts with the obligation of "abat[ing] and remov[ing] all nuisances within its jurisdiction," granting such boards the authority to "regulate the location, construction, and repair * * * of yards, pens, and stables, and of water closets, privies, cesspools, sinks, plumbing and drains."
 {¶ 39} R.C. 3709.21 provides, in relevant part, that "[t]he board of health of a general health district may make such orders and regulations as are necessary for * * * the public health, the prevention and restriction of disease, and the prevention, abatement, or suppression of nuisances."
 {¶ 40} A plain reading of both statutes clearly indicates that neither expressly delegates to public health departments the authority to regulate public swimming areas. Moreover, even if we were to presume that public swimming areas fell under the ambit of the more general authority of R.C. 3709.21, the authority to regulate under this statute is limited only to public health matters, and not matters of public safety. Jacksonv. City of Franklin (1991), 72 Ohio App.3d 431, 446 ("R.C. 3709.21
does not authorize a board of health to regulate matters pertaining to public safety.") Furthermore, as mentioned earlier, the regulation also purports to rely on former Ohio Adm. Code 3701-31-10,[3] regulating "other public bathing places," which was repealed in January of 1996, over four years before the current incident occurred. See 1995-1996 Ohio Monthly Record 1-1110, eff. Jan. 1, 1996. Thus, any attempt by the Portage County Board of Health to promulgate and enforce safety regulations under either of the aforementioned statutes or the administrative code section, would be without legal effect.
 {¶ 41} Even if we were to assume that the administrative code section to which Resolution 95-01 cites was a valid means of enacting sufficiently specific safety regulations, administrative code sections cannot, as a matter of law, be used to support a finding of negligence per se. Jaworowski v. Medical Radiation Consultants (1991),71 Ohio App.3d 320, 329 ("The only `laws' in Ohio which historically have been held to create specific and mandatory duties the violation of which constitutes negligence per se are legislative enactments, not administrative regulations.") (citations omitted); see also, Whitener v.Firwood Investment Co. (Sep. 13, 1995), 2nd Dist. No. 14938, 1995 Ohio App. LEXIS 3986, at *22. Thus, we find that in the absence of valid and enforceable safety regulations, Kelley's legal duty was one of ordinary care, i.e., an ordinary negligence standard of care.
 {¶ 42} Since we have already determined that Eric validly waived all claims sounding in negligence, we see no conceivable means by which the requirements of Resolution 95-01 may be used, to find that Kelley's conduct rose to the level of willful and wanton misconduct. See Roszmanv. Sammett, (1971), 26 Ohio St.2d 94, 96-97 ("The difference between negligence and willfulness is a difference in kind and not merely adifference in degree * * * [i]n order to establish wantonness, the conduct must be supported by evidence that shows a disposition to perversity, such as acts of stubbornness, obstinacy or persistency in opposing that which is right, reasonable, correct or generally accepted as a course to follow in protecting the safety of others") (emphasis added). Though the circumstances surrounding Eric's death are, indeed, unfortunate, "[w]illful conduct implies design, set purpose, intention, or deliberation," and "[w]anton conduct comprehends an entire absence of all care for the safety of others and a complete indifference to the consequences of the allegedly negligent act." Rinehart v. Federal Nat'lMortgage Assn. (1993), 91 Ohio App.3d 222, 229 (citations omitted). Since there is nothing in the record supporting a finding that Kelley's conduct was willful or wanton as a matter of law, Bishop's first assignment of error is without merit.
 {¶ 43} In his second assignment of error, Bishop alleges that Nelson Ledges maintained significant possession and control over the park as lessor and is therefore liable for Eric's death. Since we determined in assignments of error one and three that Eric validly waived all claims sounding in negligence, and Kelley's conduct as operator and lessee of the park did not rise to the level of willful and wanton misconduct, there is no liability to be imputed to Nelson Ledges. Bishop's second assignment of error is without merit.
 {¶ 44} For the foregoing reasons, we affirm the judgment of the Portage County Court of Common Pleas.
DONALD R. FORD, P.J., concurs with a Concurring Opinion.
CYNTHIA WESTCOTT RICE, J., concurs in part, dissents in part, with a Concurring/Dissenting Opinion.
[1] The language of the waiver is reproduced verbatim. No attempt is made herein to reproduce the type or font size as they actually appear on the sign-in sheet. This is a matter of argument in the respective briefs submitted to this court.
[2] On appeal, Bishop's counsel admitted at oral argument and in their brief that Glenn and Joretta Frohring would not be personally liable as principals of a limited liability company under R.C. 1705.48 (A). Therefore, this court, sua sponte, formally dismisses the Frohrings as parties to this appeal.
[3] Ohio Adm. Code 3701-31-01 et. seq. is authorized by R.C. Chapter 3749.02, which was enacted in 1987. R.C. 3749.02 grants public health departments the right to regulate "the issuance of licenses, * * * sanitation, safety, and operation of public swimming pools, public spas, and special use pools." R.C. 3749.02 (emphasis added). We note, however, that according to R.C. 3749.01, "public swimming pools", "spas," and "special purpose pools" have specifically defined meanings. Although 3749.01(J) defines "public bathing areas" as "an impounding reservoir, basin, lake, pond, creek, river, or other similar natural body of water," no other section within R.C. Chapter 3749 makes any mention of "public bathing areas." Thus, we can only conclude that a public health department's regulation of "public bathing areas" is not specifically authorized by this chapter. See also, 1994 Ohio Atty. Gen. Ops. No. 94-044. ("A public bathing beach * * * is not subject to regulation under R.C. Chapter 3749, unless such beach constitutes a `public swimming pool,' as defined in R.C. 3749.01(G), a `public spa,' as defined in R.C.3749.01(H), or a `special use pool,' as defined in R.C. 3749.01(I)."