OPINION
{¶ 1} Appellant, Lidia Whitfield, administratrix of the estate of Marcello Scavnicky, appeals from the December 26, 2006 judgment entry of the Trumbull County Court of Common Pleas, which granted summary judgment to appellees. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History
 {¶ 3} The present appeal stems from a tragic story of suicide, in which the now deceased, Marcello Scavnicky ("Mr. Scavnicky"), shot himself in the head on March 13, *Page 2 
2004. Following the death of Mr. Scavnicky, his sister and administratrix of his estate, Lidia Whitfield ("Ms. Whitfield"), brought a wrongful death action against his fiancée, Tina Bartek ("Tina"), Tina's mother, Twila Bartek ("Mrs. Bartek"), and her uncle, Mrs. Bartek's brother, Gene Carr ("Mr. Carr"), (hereinafter collectively "appellees"), alleging claims of wrongful death, negligence, and conspiracy.
 {¶ 4} Appellees filed a motion for leave to file summary judgment instanter on September 18, 2006, which the court granted on the following day, September 19, 2006. Attached to their motion for summary judgment, appellees submitted depositions and affidavits from Tina, Mrs. Bartek, and Mr. Carr, as well as the coroner's findings. Ms. Whitfield filed a motion in opposition on December 21, 2006, and submitted an uncertified copy of Mr. Scavnicky's negative gunshot residue report ("GSR") by the Bureau of Criminal Investigation ("BCI"), an uncertified copy of a recording of one of Mrs. Bartek's 911 calls, as well as a notarized letter from Mr. Scavnicky's mother, Gerry Scavnicky, and an affidavit from Ms. Whitfield.
 {¶ 5} On December 26, 2006, the court issued a judgment entry, which granted summary judgment in favor of appellees. The evidence presented to the trial court reflects a tragic story of domestic violence, drug abuse, and depression, which ultimately ended with Mr. Scavnicky shooting himself in the head in front of Tina. The coroner ruled the death a suicide. Thus, the court found no genuine issues of material fact remained for the trier of fact.
 {¶ 6} On the day prior to the suicide, March 12, 2004, Tina was cleaning her house in which she and Mr. Scavnicky lived, when she found an oxcycodone pill hidden on the dresser of her bedroom. Mr. Scavnicky had abused drugs in the past, and Tina *Page 3 
was afraid he was abusing them again. Knowing Mr. Scavnicky would be upset, yet not condoning drug abuse in her home, she threw away the pill.
 {¶ 7} The following day as she was getting ready to leave for work, Mr. Scavnicky confronted her about the missing pill. He was very upset and would not let her leave for work. They argued about Mr. Scavnicky's drug problem for the rest of the day, and at one point Tina gave Mr. Scavnicky an ultimatum to choose her or the drugs. Mr. Scavnicky left to purchase cigarettes, and when he returned, he was less hostile and in a different mood. Tina then left the residence, but Mr. Scavnicky called her, asking her to return. She did return later in the evening and believed that Mr. Scavnicky's behavior suggested that he was again under the influence of drugs, and another fight ensued.
 {¶ 8} At this point, Tina attempted to call her mother, Mrs. Bartek, who had been able to calm Mr. Scavnicky down in previous domestic violence situations between the couple. Mrs. Bartek did not answer. However, she returned the call moments after. Mr. Scavnicky answered and informed her that Tina could not speak at the moment, and that they were just "chilling." Mrs. Bartek could hear Tina screaming and crying in the background so she decided to drive to Tina's residence, which was about five or six miles away from her home.
 {¶ 9} By the time Mrs. Bartek arrived the altercation had escalated. Mr. Scavnicky had Tina in a headlock and was dragging her out of the house. Mrs. Bartek attempted to free Tina and Mr. Scavnicky struck her. Mrs. Bartek fell face first on the cement cobblestone drive. He then attempted to take her cell phone, but when she refused to let go, he ran back into the house after Tina, who was attempting to call 911. Mrs. Bartek then made her first call to 911, where she mistakenly gave the operator the *Page 4 
wrong house address of 2710 instead of 1898. The 911 operator attempted to give her a different number to call for assistance not recognizing the danger of the situation. At this point, Mrs. Bartek gave up, disconnected the call, and called her brother, Tina's uncle, Mr. Carr, for assistance.
 {¶ 10} Through the open front door, Mrs. Bartek heard Tina say, "No, Marcello. Please don't," followed by a popping sound. Mrs. Bartek hurriedly called 911 for the second time and asked for immediate assistance. She then ran into the house, where she saw Mr. Scavnicky laying on the floor, with a gunshot wound in his head and a gun in his hand. Tina was crying over him trying to provide assistance. Mrs. Bartek then placed her third call to 911.
 {¶ 11} Tina had been running to the kitchen to call the police when she saw Mr. Scavnicky raise the gun to his head in the living room. As she started to run towards him, he pulled the trigger and fell to the floor.
 {¶ 12} In her deposition, Tina testified that Mr. Scavnicky had a gun in his hand when he was trying to drag her out of the house. He told her he wanted to "take her for a ride." Mrs. Bartek testified in her deposition that she never saw the gun. Tina was not aware whose gun it was, but she was familiar with the gun since a friend had lent the gun to her and Mr. Scavnicky after their first gun, which was owned by Tina's grandfather, was discovered missing. The couple feared for their safety believing that the home had been broken into, and borrowed this gun, which like the first one, turned up missing after two or three months. Tina did not know from where the gun had reappeared.
 {¶ 13} Mr. Carr arrived before the police or EMS and rushed into the house. He observed Tina holding Mr. Scavnicky's head, crying. Mr. Carr, who was a retired *Page 5 
fireman with EMS training, removed the gun from Mr. Scavnicky's hand with a pen and secured the weapon. He then opened Mr. Scavnicky's airway since he was not breathing and wrapped a towel around his head to control the bleeding. He managed to maintain an airway, and Mr. Scavnicky began breathing again. He called 911, inquired as to their arrival and informed them that the scene was "safe," which meant the scene had been secured.
 {¶ 14} EMS soon arrived on the scene and attended to Mr. Scavnicky, bagging his hands in the process. EMS allowed Tina to ride in the ambulance when they transported Mr. Scavnicky to the hospital. At the house, Mrs. Bartek and Mr. Carr gave statements to the police. At the time Mr. Carr gave his statement to the police, he questioned the officer as to whether a GSR swab should be taken from all present on the scene, which was in his experience a customary procedure. The officer told him that the family had been through enough trauma and that such a test would be unnecessary in this case. A GSR test was performed on Mr. Scavnicky on March 16; several days after the incident and after his hands had been apparently cleaned while he was being treated at the hospital. The GSR test came back negative for gunshot residue on Mr. Scavnicky's hands.
 {¶ 15} At approximately 10:15 a.m. on March 16, 2004, Mr. Scavnicky passed away. Post-mortem toxicology findings of Mr. Scavnicky included hydrocodone, oxcycodone, and phenytoin. Medical records obtained by the coroner documented past suicide attempts, the last on February 21, 2003. During that hospitalization, his drug screen was positive for marijuana, cocaine, and benzodiazepines. A bong containing marijuana residue was also secured from the living room, which was allegedly Mr. Scavnicky's. *Page 6 
 {¶ 16} After investigating the matter, the coroner determined and certified that Mr. Scavnicky's cause of death was suicide.
 {¶ 17} Accordingly, after reviewing the evidence, the trial court found that no genuine issue of material fact remained for a trier of fact, and thus granted summary judgment in favor of appellees.
 {¶ 18} Ms. Whitfield now timely appeals and raises one assignment of error:
 {¶ 19} "The court erred in granting summary judgment in favor of the defendants."
 {¶ 20} Summary Judgment
 {¶ 21} "This court reviews de novo a trial court's order granting summary judgment." Briel v. Dollar General Store, 11th Dist. No. 2007-A-0016, 2007-Ohio-6164, ¶ 17; Hudspath v. Cafaro Co., 11th Dist. No. 2004-A-0073, 2005-Ohio-6911, ¶ 8, citing Hapgood v. Conrad, 11th Dist. No. 2000-T-0058, 2002-Ohio-3363, ¶ 13. "A reviewing court will apply the same standard a trial court is required to apply, which is to determine whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." Id.
 {¶ 22} "Since summary judgment denies the party his or her `day in court' it is not to be viewed lightly as docket control or as a `little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party." Id. at ¶ 18, citingWelch v. Ziccarelli, 11th Dist. No. 2006-L-229, 2007-Ohio-4374, ¶ 40.
 {¶ 23} "In Dresher v. Burt [(1996), 75 Ohio St.3d 280], the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on *Page 7 
a material element of the nonmoving party's claim. The evidence must be in the record or the motion cannot succeed." Id.
 {¶ 24} "The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in Misteff v. Wheeler (1988), 38 Ohio St.3d 112." Id.
 {¶ 25} "The court in Dresher went on to say that paragraph three of the syllabus in Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, is too broad and fails to account for the burden Civ.R. 56 places upon a moving party. The court, therefore, limited paragraph three of the syllabus in Wing to bring it into conformity withMisteff." Id. at 19, citing Ziccarelli at ¶ 41.
 {¶ 26} Furthermore, "[i]n order to prevail in a wrongful death cause of action, the personal representative of the decedent must prove these elements: `1) a wrongful act, neglect or default of defendant which proximately caused the death and which would have entitled the decedent to maintain an action and recover damages if death had not ensued; 2) that a decedent was survived by a spouse, children, parents, or other next of *Page 8 
kin; and 3) that the survivors suffered damages by reasons of the wrongful death.'" Bishop v. Nelson Ledges Quarry Park, Ltd., 11th Dist. No. 2004-P-0008, 2005-Ohio-2656, ¶ 19, citing McCormac, Wrongful Death in Ohio § 2.02.
 {¶ 27} Genuine Issue of Material Fact
 {¶ 28} In her sole assignment of error, Ms. Whitfield contends that the trial court erred in granting summary judgment in favor of appellees. Specifically, Ms. Whitfield contends that the court erred in finding that no genuine issue of material fact exists since the negative GSR test that was performed on Mr. Scavnicky three days after the shooting and after his hands were cleaned, raises a genuine issue of whether he fired the gun that evening. For the following reasons, we find this contention to be without merit.
 {¶ 29} The evidence presented on summary judgment reflects that there is no genuine issue of material fact. This case presents a tragic story of a young man who suffered from mood and personality disorders with suicidal behavior, physical violence and drug abuse, and who ultimately took his own life. Although Ms. Whitfield contends that the negative GSR test performed on Mr. Scavnicky raises a doubt as to whether he fired the gun on the night of his death, the very test results indicate otherwise. Specifically, the BCI examiner states in the GSR report that "[t]he absence of gunshot primer residue on a person's hands does not preclude the possibility of that person having discharged a firearm." Moreover, the GSR test was not performed on Mr. Scavnicky until March 16, 2004, three days after the shooting, and after the bags were taken off his hands and they were cleaned while he was being treated at the hospital.
 {¶ 30} There is simply no evidence indicating foul play in this case. The coroner in his June 18, 2004 report declared Mr. Scavnicky's death a suicide after he conducted *Page 9 
an investigation into the matter, which included consideration of the Scavnicky family's "suspicions of foul play."
 {¶ 31} Ms. Whitfield contends that the fact that Mr. Carr removed the gun from Mr. Scavnicky's hand is evidence of a conspiracy. Mr. Carr, who was a firefighter with EMS training, testified in his deposition that he removed the weapon from Mr. Scavnicky's hand with a pen because it is standard procedure to remove an automatic weapon from a person who is deceased or suffering from a head trauma. He explained that as the body experiences the stages of death or seizure, rigor mortis sets in, which causes the body to spasm in what is termed a "cadaver spasm." Thus, it is standard protocol for EMS or police upon arrival at the scene to remove the weapon from the victim's hand so that in the case of spasm, the gun is not fired. Mr. Carr also testified that he asked the officer to give all those present on the scene, including himself, a GSR test. The officer, however, declined to do so, remarking that it was unnecessary in this case.
 {¶ 32} Ms. Whitfield's answer brief in opposition to appellees' motion for summary judgment contains only conjecture and suspicion of foul play citing nothing other than inferences from defective and presumptive evidence that no shot could be heard on the 911 call, that EMS were sent to the wrong address, that Mrs. Bartek never saw a gun in Mr. Scavnicky's hand, that the gun did not belong to Mr. Scavnicky; and further, that Tina stated at Mr. Scavnicky's bedside that "it was an accident," which is a statement Tina denies making.
 {¶ 33} Moreover, pursuant to R.C. 313.19, there is a presumption that the coroner's verdict "shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death * * *." Thus, "[t]he coroner's factual *Page 10 
determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." Vargo v. TravelersIns. Co. (1987), 34 Ohio St.3d 27, paragraph one of the syllabus. Without more than mere suspicion and conjecture, Ms. Whitfield could not meet her reciprocal evidentiary burden in this case.
 {¶ 34} While we sympathize with her loss, Ms. Whitfield has failed to establish that a genuine issue of material fact exists as to the direct and proximate cause of Mr. Scavnicky's death.
 {¶ 35} For the foregoing reasons, we affirm the judgment of the Trumbull County Court of Common Pleas.
 DIANE V. GRENDELL, P.J., CYNTHIA WESTCOTT RICE, J., concur. *Page 1